COCA–COLA BOTTLING COMPANY OF ELIZABETHTOWN, INC., Plaintiff,

v.

The COCA–COLA COMPANY, a Delaware corporation, Defendant.

Civ. A. No. 81–48.

United States District Court,
D. Delaware.

April 12, 1983.

As Amended April 27, 1983.

Edmund N. Carpenter, II, Richards, Layton & Finger, Wilmington, Del., for plaintiff; Emmet J. Bondurant, Thomas B. Metzloff, and Deborah J. Merritt, Bondurant, Miller, Hishon & Stephenson, Atlanta, Ga., Roger N. Nanovic, Jim Thorpe, Pa., of counsel.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III, and Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants; Griffin B. Bell, Frank C. Jones, and Joseph R. Gladden, Jr., King & Spalding, Atlanta, Ga., of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Apparently not everyone agrees that things go better with "Coke." Plaintiff, Coca-Cola Bottling Company of Elizabethtown ("Elizabethtown"), seeks declaratory, injunctive and monetary relief against the Coca-Cola Company ("Coca-Cola"). At issue in this lawsuit are questions arising from substantially similar Settlement Agreements entered as final judgments (hereinafter the Settlement Agreements and the final judgments will be referred to collectively as the "1921 Consent Decrees" or "Consent Decrees") in settlement of *Coca-Cola Bottling Co. v. The Coca-Cola Company,* C.A. Nos. 388 & 389 (D.Del.1921) ("Case No. 388" and "Case No. 389"), and a contract between the plaintiff and Coca-Cola (the "Bottler's Contract") which allegedly incorporates some of the provisions of the Consent Decrees. Plaintiff seeks to resolve several issues involving the composition and pricing of Bottler's Coca-Cola Syrup ("Bottler's Syrup" or "syrup") which it purchases from Coca-Cola.

Elizabethtown asserts three principal claims against Coca-Cola. First, it contends that Coca-Cola's newly initiated practice of substituting high fructose corn syrup for fifty percent of the granulated sugar in Bottler's Syrup while continuing to charge for syrup based on the price of granulated sugar violates the 1921 Consent Decree and its Bottler's Contract. Second, plaintiff challenges Coca-Cola's use of refiners' list prices rather than the actual cost of granulated sugar to compute syrup prices. Finally, plaintiff seeks a recomputation of the price of syrup based on a $4.3 million settlement that Coca-Cola received in a sugar price-fixing case. Jurisdiction is present on the basis of diversity. 28 U.S.C. § 1332(a)(1) & (c).[1]

Presently before the Court is Elizabethtown's motion for reargument and reconsideration of this Court's denial of plaintiff's motion for class certification, 95 F.R.D. 168, 179 (D.Del.1982), and, in the alternative, for certification to appeal, pursuant to 28 U.S.C. § 1292(b), the ruling that plaintiff has no standing to enforce the Consent Decree entered into in 1921 by Coca-Cola and Coca-Cola Bottling Co. (the "Thomas Co." or "Thomas") in Case No. 388. Also before the Court are the motions of Elizabethtown and certain other bottlers[2] to intervene in Case No. 388, to file an intervenors' complaint, similar to Elizabethtown's complaint in C.A. No. 81–48, and to proceed in that case as a class. In addition, the movants, other than Elizabethtown, seek to intervene in the present case, C.A. No. 81–48, and to consolidate the present case and Case No. 388. Similarly, another group of bottlers[3]

---

1. The plaintiff is a Kentucky corporation with its principal place of business in Kentucky. The Coca-Cola Company is a Delaware corporation with its principal place of business in Georgia.

2. The following bottlers seek to intervene in Case No. 388: Coca-Cola Bottling Company of Elizabethtown, Inc.; Jackson Coca-Cola Bottling Company; Dixie Coca-Cola Bottling Company, Incorporated; Wilmington Coca-Cola Bottling Works, Incorporated; New Bern Coca-Cola Bottling Works, Inc.; Kelford Coca-Cola Bottling Company, Inc.; Plymouth Coca-Cola Bottling Company, Incorporated; Owensboro Coca-Cola Bottling Company, Inc.; Sacramento Coca-Cola Bottling Co., Inc.; Coca-Cola Bottling Company of Shelbyville, Inc.; Beaver Coca-Cola Bottling Co.; Quaker State Coca-Cola Bottling Company; The Cleveland Coca-Cola Bottling Company, Inc.; Keystone Coca-Cola Bottling Company; Central Coca-Cola

Bottling Company, Inc.; Reading Coca-Cola Bottling Works; and Decatur Coca-Cola Bottling Co. All of these bottlers claim to operate in the territories formerly controlled by the Thomas Co. *See infra* 258–259. In addition, each of these bottlers has not amended its Bottler's Contract with Coca-Cola. *See infra* p. 261.

3. The following bottlers seek to intervene in Case No. 389: Coca-Cola Bottling Company of Shreveport, Inc. (formerly named Star Bottling Works, Ltd.); The Coca-Cola Bottling Company of Fort Smith, a partnership; Texarkana Coca-Cola Bottling Company; Coca-Cola Bottling Company; Las Cruces Coca-Cola Bottling Company; West Plains Coca-Cola Bottling Company; The Coca-Cola Bottling Company of Tucson, Inc.; Hattiesburg Coca-Cola Bottling Company; Magnolia Coca-Cola Bottling Company, Inc.; Coca-Cola Bottling Company of Tulsa, Inc.; Ouachita Coca-Cola Bottling Com-

have moved to intervene and file a supplemental complaint in Case No. 389. These bottlers are led by Coca-Cola Bottling Co. of Shreveport, Inc.[4] ("Shreveport")—an original intervenor in Case No. 389. These movants seek to file an intervenors' complaint—similar to Elizabethtown's complaint—and to proceed as a class in Case No. 389. They also seek to intervene in the present case, C.A. No. 81–48,[5] and to consolidate this case, Case No. 388 and Case No. 389. The Court will deal with all motions in these cases in this opinion.

On the basis of the present factual record, the facts germane to these motions are as follows.[6] The genesis of the Coca-Cola bottling system occurred in 1899. Two Chattanooga lawyers, B.F. Thomas and J.B. Whitehead, obtained the right to purchase Bottler's Syrup at a fixed price and use Coca-Cola trademarks to sell the soft drink, Coca-Cola, throughout the United States in bottles or other receptacles.[7] (Doc. 110, Ex. B). The Coca-Cola Company reserved only the right to manufacture syrup and to sell syrup to Thomas and Whitehead and their assignees and to soda fountains.[8] The lawyers established bottling plants in Chattanooga and Atlanta and formed Coca-Cola Bottling Company as a Tennessee corporation in December, 1899.

Coca-Cola Bottling Company did not bottle or sell Coca-Cola itself. Rather it contracted with so-called "actual" or "first-line" bottlers who built, owned, and operated plants and bottled, promoted, and sold Coca-Cola in the exclusive territories assigned to them. The parent bottler assigned to the actual bottlers all rights to purchase Coca-Cola syrup and to bottle and sell Coca-Cola in a given territory.

In 1900, the Bottling Company divided into two parts, apparently in a business dispute over the nature of the contracts to be granted to the actual bottlers. Whitehead wanted to give them perpetual contracts, but Thomas sought to grant them only term contracts of two-year duration. With the consent of Coca-Cola, Thomas retained ownership of Coca-Cola Bottling Company, and conveyed to Whitehead and his new business partner, J.T. Lupton, all rights acquired under the 1899 contract except for distribution in fifteen states, the District of Columbia, and small parts of Georgia and Alabama. (Doc. 110,. Ex. D). Coca-Cola, Thomas and Whitehead amended the 1899 Agreement to reflect the division of Coca-Cola Bottling Co. (Doc. 110, Ex. C).[9] Whitehead and Lupton ultimately named their company The Coca-Cola Bottling Company (the "Whitehead Co." or "Whitehead"). Between 1899 and 1915 there

pany, Inc.; Natchez Coca-Cola Bottling Co., Inc.; Wichita Coca-Cola Bottling Co.; Coca-Cola Bottling Co. (North Dakota); Coca-Cola Bottling Co. West Point-LaGrange; Marshall Coca-Cola Bottling Co.; and Permian Coca-Cola Bottling Co. All of these bottlers claim to operate in the territories formerly controlled by the Whitehead-Lupton Co. See infra pp. 258–259. In addition, each of these bottlers has not amended its Bottler's Contract with Coca-Cola. See infra p. 261.

4. Since Shreveport was a party to Case No. 389 only those other bottlers in the former Whitehead territories who did not intervene in Case No. 389 are actually moving to intervene in that case. Shreveport also seeks to file the same complaint in Case No. 389 as do the other intervening Whitehead Bottlers.

5. All bottlers identified in note 2, supra, with the exception of Elizabethtown and all bottlers identified in note 3, supra, seek to intervene in C.A. No. 81–48.

6. These findings of fact are subject to modification if dictated by subsequent development of the record.

7. Eight states were not included in the agreement—the six New England states, Mississippi, and Texas.

8. The contract is reproduced in full at Coca-Cola Bottling Co. v. The Coca-Cola Co., 269 F. 796, 800–01 (D.Del.1920). Thomas and Whitehead were not involved in the sale of Coca-Cola syrup for use at soda fountains.

9. The parent companies further subdivided their territories among five companies known as "subparent bottlers." The Whitehead Company subparent bottlers were Western Coca-Cola Bottling Co. and The Coca-Cola Bottling Company (1903); the Thomas Company subparent bottlers were Coca-Cola Bottling Works, Coca-Cola Bottling Works 3d, and Pacific Coca-Cola Bottling Co.

might have been some oral modification of the 1899 agreement. In 1915, the 1899 contracts between Thomas and Coca-Cola and between Whitehead and Coca-Cola were expressly amended allegedly to conform with the 1914 enactment of the Clayton Act. (Doc. 110, Exs. E & F). At this time, the parent bottlers, the Whitehead Co. and the Thomas Co., modified their contracts with their actual bottlers to reflect the 1915 amendments. *See, e.g.,* Doc. 111, Ex. A, at A–1.

In 1919, the Coca-Cola Company was purchased by a banking syndicate and became a Delaware corporation, assuming the obligations to the parent bottlers. The new corporation entered into an agreement with the principal parent bottlers in December of 1919 to permit the Company to pass on cost increases of sugar in excess of nine cents per pound to the parent bottlers. The Company then sought to enter into new contracts with the parent bottlers which would permit the Company to raise its syrup prices at will. When the parent bottlers strongly rejected this proposal in January 1920, the Coca-Cola Company informed them that their contracts were contracts at will and could be terminated. Efforts to avoid a confrontation proved unsuccessful, and when the parent bottlers threatened to withdraw their consent to temporary price changes unless the Company acknowledged the perpetual nature of their contracts, the Company notified them that their contracts were terminated as of May 1, 1920.

The two principal parent bottlers brought suit in the U.S. District Court for the District of Delaware on June 1, 1920, seeking to enjoin the Company from terminating their contracts. Six first-line bottlers,

members of the Coca-Cola Bottlers Association, intervened in support of the parent bottlers.[10] The bottlers had received an initial favorable determination from the Court on November 8, 1920. In *The Coca-Cola Bottling Co. v. The Coca-Cola Co.,* 269 F. 796 (D.Del.1920), the Court granted the parent bottlers' motion for preliminary injunctions, stating that their contracts with the Company were perpetual and that the parent bottlers had received property rights in the bottling business from the Company. *See* 269 F. at 816. The appeal of this case was pending when the parties executed separate settlement agreements on July 6, 1921.[11] The Court formally incorporated those agreements as final judgments on October 4, 1921.[12]

The Consent Decrees, in addition to being final judgments, amended the contracts, entered into in 1899 and modified in 1915,[13] between Coca-Cola and its parent bottlers. In paragraph 2, the Consent Decrees state that the contracts between the parent bottlers and the actual bottlers would be perpetual. In paragraphs 5 and 6, the price of Coca-Cola syrup to the parent bottlers was fixed at $1.17½ per gallon as a minimum price, and the ceiling price of sale to the actual bottlers set at $1.30 per gallon. In paragraph 7, the parties further agreed on a formula for pricing syrup in the future which would include all increases in cost to the Company based on the market price of sugar as quoted quarterly by the ten largest refineries in the United States. In addition, paragraph 10 of the decrees provided that Bottlers' Coca-Cola Syrup would contain no less than 5.32 pounds of sugar per gallon.[14]

---

10. The Court permitted the intervention on November 8, 1920. *See* 269 F. at 815. All of these intervenors were under contract with the Whitehead Co.

11. The intervening Whitehead Bottlers were not signatories to these Settlement Agreements; however, they did sign the final judgment and agree to have those Settlement Agreements entered as final judgments. (Doc. 110, Ex. G and Ex. H).

12. Again, hereinafter the Settlement Agreement and the final judgments will be collective-

ly referred to as the "1921 Consent Decrees" or "Consent Decrees".

13. *See* Doc. 110, Ex. G ¶ 2, Ex. H ¶ 2.

14. The relevant portions of the Consent Decrees (Doc. 110, Exs. G & H) are as follows:
    2: The present contract between the said parties described in the pleadings in the above entitled cause, as hereby expressly modified and changed, shall remain of full force and effect, and is hereby agreed to be perpetual, and the same shall apply to the

The Whitehead Company's settlement was temporarily conditioned on Whitehead's attempt to obtain from its actual bottlers acceptance of modification of their Bottler's Contracts so that the contracts would conform to the Consent Decrees.[15] (Doc. 111, Ex. H, ¶¶ 15 & 16). The Thomas Company's bottlers had two-year term contracts which for the most part had expired during the course of the litigation. The Thomas Company entered into new form perpetual contracts with its bottlers which conformed to the Consent Decrees.[16]

parties hereto and their respective successors and assigns; but no assignment shall be made by the party of the first part without the consent of the party of the second part, as provided in the original contract.

3: The said contract modified shall operate perpetually, but if abnormal or burdensome conditions prevail and the said parties fail to agree on a modification of prices and terms to meet such abnormal or burdensome conditions of occurrence and to continue during the same, then either party shall have the right to demand arbitration as to the price and terms; and if they disagree as to whether or not abnormal or burdensome conditions or occurrence exist, then that question shall also be arbitrated.

\* \* \* \* \* \*

5: The parties hereto hereby raise the contract price of Coca-Cola Bottlers Syrup as fixed by said existing contract to one dollar and seventeen and a half cents ($1.17½) per gallon delivered as heretofore, including five cents (5¢) per gallon for advertising matter to be delivered at actual cost and freight expenses, and said party of the first part is hereby relieved and discharged from any and all obligations to spend anything for advertising; but it shall be bound to sell and deliver, at such actual cost, the same amount of advertising matter delivered to it by the party of the second part, to the actual Bottlers, as herein provided for. The party of the first part furthermore agrees to pay an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; same to include all possible increases in the cost of producing such syrup by the party of the second part other than may arise under, and as provided for by the arbitration clauses herein.

6: In order to promote the sale of Coca-Cola and enable the actual bottlers to compete with other beverages, the party of the first part hereby agrees to sell such syrup to the bottlers purchasing from it at not exceeding one dollar and thirty cents ($1.30) per gallon, including five cents (5¢) per gallon for advertising matter to be delivered, and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; the party of the first part hereby further agrees that any increase in price or change in terms growing out of any agreement or arbitration as provided under paragraph three hereof shall not be exceeded or increased by it in any sales it may make of said syrup to the bottlers purchasing the same from it.

7: It is agreed between the parties that the price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

\* \* \* \* \* \*

10: The party of the second part contracts that the syrup sold and furnished by it to the party of the first part is to be high grade standard Bottlers Coca-Cola Syrup, and shall contain no less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

\* \* \* \* \* \*

12: Under no conditions shall the arbitration provided for herein reduce the price per gallon to be paid by the party of the first part to the party of the second part for Bottlers' Syrup, below the price hereinbefore specified, of one dollar and seventeen and a half cents ($1.17½) per gallon, including therein five cents (5¢) per gallon for advertising matter.

15. Paragraphs 15 and 16 read:

15: This settlement is conditioned upon the consent of the actual bottlers to the modification of their contracts with the party of the first part in accordance with the terms of this agreement.

16: The parties hereto will request the Court of Appeals to postpone a decision until it can be determined whether such actual bottlers will consent. If such consent cannot be secured by September 1st, 1921, the parties to this agreement will agree upon the plan of procedure, and if they fail so to agree, shall submit the matter to arbitration as to what shall be done in regard thereto.

16. The Bottler's Contract of the Coca-Cola Bottling Co. of Louisville, dated Nov. 1, 1921 (Doc. 110, Ex. A at A–1–a), is typical of the contracts entered into by Thomas Bottlers in 1921 after entry of the Consent Decrees.

Between 1923 and 1975, the Company acquired all parent bottlers and assumed their obligations to the actual bottlers. Beginning in 1978, the Company sought amendments to its contracts with all actual bottlers to permit a new formula for pricing syrup using a "sugar element," a "base element," and the Consumer Price Index. As of the date of this opinion, approximately 93 bottlers had declined to amend their contracts. These unamended bottlers continue to operate under Bottler's Contracts entered into in 1921 or before or Bottler's Contracts which, to a substantial degree, have as their historical antecedent the 1921 Bottler's Contracts. Beginning in 1980, Coca-Cola began substituting high fructose corn syrup 55 ("HFCS–55" or "fructose") for part of the granulated sugar in the Bottler's Syrup sold to most if not all amended and certain unamended bottlers.

The facts underlying the plaintiff's claim for recomputation of the price of syrup are basically the following. Prior to 1979, in a matter ·unrelated to Coca-Cola's seeking amendments to the Bottler's Contracts, Coca-Cola received $4,326,825.88 in settlement of the *Western Sugar* antitrust case. *In Re Sugar Industry Antitrust Litigation,* MDL 201 (N.D.Cal.1979). Previous to settling this civil action, the sugar industry defendants pled *nolo contendere* to criminal charges of conspiracy to fix and stabilize both the published list prices and the effective selling prices of refined sugar in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, during the period 1970–74.

## I. *Introduction*

In order to assess the various motions before the Court, it will be necessary to set forth with some detail the plaintiff's claims made on behalf of all unamended bottlers against the defendant and upon which class certification is being sought. In Count I plaintiff seeks a declaration that Coca-Cola's substitution of fructose for granulated sugar in Bottler's Syrup violates both the 1921 Consent Decrees and the Bottler's Contract of each unamended bottler. Plaintiff seeks to enjoin Coca-Cola from continuing to substitute fructose in violation of the Consent Decrees and the Bottler's Contracts. Plaintiff also seeks monetary damages for the defendant's alleged breach of the Consent Decrees and the Bottler's Contracts. At issue is whether paragraph 10 of the 1921 Consent Decrees [17] and the terms describing Bottler's Syrup in the individual Bottler's Contracts preclude the substitution of fructose for granulated sugar in Bottler's Syrup. Alternatively, if unsuccessful in establishing that the use of fructose constitutes a violation of the Consent Decrees or the individual Bottler's Contracts, plaintiff seeks equitable relief in the form of money damages for Coca-Cola's unjust enrichment from using fructose in Bottler's Syrup while basing the price of such syrup on the price of granulated sugar which is more expensive than fructose.

In Count III [18] plaintiff seeks a declaration that the pricing provision for Bottler's Syrup contained in the Consent Decrees and the individual Bottler's Contracts requires Coca-Cola to determine the price of syrup from the actual cost, and not the list price, of granulated sugar as quoted by the ten largest refiners of granulated sugar. Plaintiff also seeks monetary damages for Coca-Cola's alleged violation of the pricing term of the 1921 Consent Decrees and the Bottler's Contracts. At issue is the meaning of the words "market price of standard granulated sugar . . . as quoted at the refineries by the ten refineries" in paragraph 7 of the 1921 Consent Decrees [19] and the corresponding provisions in all Bottler's Contracts. According to the complaint, Coca-Cola for an unknown period has been pricing Bottler's Syrup on the basis of "list prices" or "asking prices" of granulated sugar being quoted by the refiners instead of "market prices," that is, the price actually paid by

---

**17.** See supra note 14.

**18.** Count II of the complaint was withdrawn as a separate basis for relief at oral argument on February 1, 1983. (Doc. 147 at 37).

**19.** *See supra* note 14.

Coca-Cola after deductions of discounts, rebates or allowances commonly given to Coca-Cola, as the largest single purchaser of granulated sugar in the United States. Alternatively, if unsuccessful in establishing that the use of fructose constitutes a violation of the Consent Decrees or the individual Bottler's Contracts, plaintiff seeks equitable relief in the form of money damages for Coca-Cola's unjust enrichment from basing the price of such syrup on the list rather than the actual price of granulated sugar.

In Counts I and III, plaintiff and proposed intervenors seek to recover on alternative theories: enforcement of the 1921 Consent Decrees, which encompass the agreement between parent bottlers and Coca-Cola, breach of the Bottler's Contracts between the former parent bottlers now part of Coca-Cola and the bottlers, and unjust enrichment. The unjust enrichment claims in Counts I and III will not be further discussed here. The "pricing" count, Count III, cites language in the Bottler's Contracts with the parent bottlers which corresponds closely to the language of the decrees.[20] The same cannot be said for the fructose count, Count I. The pertinent language of the 1921 Consent Decrees is found in ¶ 10:

> 10: The party of the second part contracts that the syrup sold and furnished by it to the party of the first part is to be high grade standard Bottlers Coca-Cola Syrup, and shall contain no less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

(Doc. 110, Exs. G & H, ¶ 10). In contrast the Bottler's Contracts do not reference the sugar content of each gallon of syrup but

only describe Bottler's Syrup as "Coca-Cola syrup," "Bottlers' Coca-Cola syrup" and with words of like impact. *See, e.g.*, Doc. 110, Ex. A. at A–1–a.

Plaintiff and proposed intervenors assert with confidence they will be able to demonstrate that the pertinent language in the 1921 Consent Decrees and the Bottler's Contracts should and do have identical meanings in the context of the disputes over use of fructose and pricing. Their confidence stems in part from the uncontested fact that the Consent Decrees reflect merely another step in the contractual relationship among Coca-Cola, parent bottlers and actual bottlers. As in 1915, in 1921 the actual Bottler's Contracts had to be modified or entered into anew upon entry of the Consent Decrees after the amendment of the contracts between Coca-Cola and the parent bottlers. The similarity of language employed in the Consent Decrees and the Bottler's Contracts, the plaintiff argues, supports the theory that the relevant provisions of the decrees and the contracts have identical meanings. While confident, they are also prudent. Parallel theories of liability, violation of the 1921 Consent Decrees and breach of the Bottler's Contracts, are pleaded in both Counts I and III. Thus, in interpreting the Bottler's Contracts, if the language of the 1921 Consent Decrees is not employed or imported into those contracts in the manner urged by the bottlers or if Coca-Cola would have defenses to the Bottler's Contract claims that they would not have available as to the 1921 Consent Decrees, for example, a statute of limitations defense, then the bottlers theorize they would nonetheless prevail on direct enforcement of the 1921 Consent Decrees. This

---

**20.** The pricing language in the decrees is contained in paragraph 7. *See supra* note 14. The corresponding language of a typical Bottler's contract reads:

> The market price of sugar on which the foregoing sliding scale is based, is to be determined quarterly, January, April, July and October of each year, by averaging the market price of standard granulated sugar during the first week in such quarter as quoted at the refineries by the ten refineries operating in the United States, having the largest capacity

> and output; but the ten refineries whose prices are to be used in obtaining the average price as herein stated and the fixing of that market price shall be as determined by the party of the first part and The Coca-Cola Company. If each does not accompany the order for said syrup, then party of the first part is to have the right to draw on party of the second part, with bill of lading attached, for the full purchase price.

Doc. 110, Ex. A, ¶ 4(d).

result could be obtained, speculate the bottlers, even though the Consent Decrees, while interpreted as of 1921, must be enforced not in a vacuum, but with the gloss of over sixty years of actual operation under the decrees. Those sixty years include, of course, entry into or modification of the Bottler's Contracts with the parent bottlers following the Court's entry of the settlement agreements as final judgments in the 1921 litigation.

In Count IV (Doc. 55), plaintiff asserts another unjust enrichment claim against Coca-Cola. Plaintiff seeks a declaratory judgment and a monetary award on the grounds that Coca-Cola is obligated to make a retroactive adjustment in the price charged for each gallon of syrup purchased by the bottlers during the period 1970–1974 that reflects the average dollar amount per pound of refined sugar Coca-Cola received on its purchases of sugar in settlement of *In Re Western Antitrust Litigation,* MDL 201 (N.D.Cal.1979).[21]

## II. *Motion for Reargument and Reconsideration*

In denying the motion for class certification the Court found that the plaintiff failed to satisfy the prerequisites for a class action contained in Fed.R.Civ.P. 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

It was held that the plaintiff failed to satisfy the prerequisites of commonality of questions of law or fact and typicality of claims between the putative class representative and the class members. Specifically, the Court found that Elizabethtown did not have standing to enforce the 1921 Consent Decrees and, therefore, could not claim in support of its class certification motion that questions of law and fact relating to the enforcement of that decree were common to the class. 95 F.R.D. at 175–77. It was also found that the contractual claims of the putative class members did not involve common questions of law and fact. In this diversity action, the Court concluded the interpretation of the Bottler's Contracts of each unamended bottler could well involve the law of thirty-two different states. Moreover, each member's contractual claim would involve differing facts regarding the course of dealing under each contract and the application of different state's laws to each set of facts. With respect to typicality, the Court found that "in light of the fact that the suit would necessarily focus on individual contract interpretation, it is unlikely that any party could be considered to have claims typical of the class." 95 F.R.D. at 178.

In seeking reconsideration, the plaintiff focuses primarily on the Court's holding that Elizabethtown does not have standing to enforce the 1921 Consent Decrees. The plaintiff argues that under the doctrine of res judicata and collateral estoppel it has standing to enforce the decree as the privy, assignee and virtual representee of the Thomas Company—a party to the 1921 decree entered in Case No. 388. The plaintiff also argues that, as a third-party beneficiary of this 1921 decree, Elizabethtown has standing to enforce the decree. The plaintiff challenges the Court's holding that un-

---

**21.** Plaintiff acknowledges that all Coca-Cola bottlers, amended or unamended, should share in the proceeds of this antitrust settlement. The distribution, plaintiff asserts, should be based upon the amount of syrup purchased by each bottler from 1970–1974 under their Bottler's Contracts and Pre-Mix Contracts (Doc. 55, Ex. K). Under the Pre-Mix Contracts, the bottlers purchase Coca-Cola B–X syrup for use in vending machines dispensing Coca-Cola by the cup. Although plaintiff alleges that all bottlers are entitled to this refund, certification is sought only for the unamended bottlers. Plaintiff has stated that any recovery by the unamended bottlers would account for any amount attributable to the amended bottlers who are not represented in this case.

der *Blue Chip Stamps Co. v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975), a consent decree is not enforceable directly or in collateral proceedings by non-parties even though they were to be benefited by it. Plaintiff argues that *Blue Chip Stamps* only prohibits enforcement by non-parties of consent decrees entered in settlement of government anti-trust litigation. Regarding the commonality of questions of law or fact and typicality of the Bottler's Contract claims, the plaintiff argues that the law of only one state, Delaware or Georgia, governs the contractual claims of the putative class. Finally, the plaintiff urges that there are no significant individual issues of fact among the unamended bottlers which would lead to a different result even if the laws of different states were applicable. Defendant, Coca-Cola, maintains that the plaintiff's and each class member's claims are principally based upon their individual Bottler's Contract, governed by the law of different states and, therefore, not suitable for class treatment.

As a preliminary matter, the Court must reassess its finding that plaintiff did not have standing to enforce, at least, the 1921 Consent Decrees entered in Case No. 388. A reexamination of the plaintiff's position indicates that a meritorious, though not necessarily successful, argument can be made .that the plaintiff has standing to enforce, at least, the Consent Decree entered in Case No. 388 (the Thomas case). The prohibition in *Blue Chip Stamps v. Manor Drug Stores* against third-party beneficiaries enforcing consent decrees may only apply to consent decrees entered in government anti-trust cases.[22] Alternatively, under evolving doctrines of res judicata and collateral estoppel the plaintiff and other unamended bottlers may be bound by the 1921 Consent Decrees and therefore entitled to enforce the decree.[23] However, the Court need not have decided these issues in that they were not necessary for a determination of the class certification motion then before the Court. Nor, as will be shown below, is resolution of this standing question necessary at this time.[24] In withdrawing the holding that plaintiff cannot enforce the Consent Decrees, the Court does not express an opinion on this issue. The issue will be addressed when and if a decision is necessary for the proper adjudication of this case.[25]

■ Turning to the merits of plaintiff's reconsideration motion, plaintiff seeks to represent a class of so-called "unamended" bottlers—bottlers who have not amended their contracts with Coca-Cola to permit certain modifications in the composition and pricing of syrup. The proposed class now consists of ninety-three unamended bottlers from thirty states.[26] In a motion for class

**22.** The cases cited in *Blue Chip Stamp*, 421 U.S. at 750, 95 S.Ct. at 1932, and in the reversed lower court opinion by the Circuit Court of Appeals in *Blue Chip Stamps*, 492 F.2d 136, 144 (9th Cir.1973). (Hufstedler, J., dissenting), deal primarily with the enforcement of government antitrust decrees by non-parties. At least one case has dealt with third-party enforcement of consent decrees entered between private parties. *See, e.g., La Chemise Lacoste v. Alligator Co.*, 374 F.Supp. 52, 63–68 (D.Del.), *vacated on other grounds*, 506 F.2d 339 (3d Cir.1974), *cert. denied*, 421 U.S. 937, 95 S.Ct. 1666, 44 L.Ed.2d 94 (1975) (where the Court discussed the merits of plaintiff's attempt to enforce as a third-party beneficiary a consent decree between two private parties). If a third-party is not precluded from enforcing a consent decree entered into by private parties, then it appears that under Delaware conflicts of law rules the issue of Elizabethtown's status as a third-party beneficiary would be governed by Delaware law. *See*

*infra* note 35. *See also American Financial Corp. v. Computer Sciences Corp.*, 558 F.Supp. 1182, 1185–1186 (D.Del.1983) (analysis of Delaware law on third-party beneficiaries).

**23.** *See* 18 C. Wright, A. Miller & Cooper, Federal Practice and Procedure §§ 4451, 4456 & 4457 (1981 & Supp. 1982).

**24.** *See infra* p. 278.

**25.** Further reliance by any party to this litigation on the Court's now withdrawn finding on plaintiff's standing to enforce the consent decree would be unwarranted. In light of the Court's withdrawal of its holding on standing, 95 F.R.D. at 175–77, the motion for certification to appeal this issue will be denied.

**26.** Alabama, Arizona, Arkansas, California, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas,

certification, the plaintiff must make a prima facie showing in its pleading satisfying Rule 23. The burden of proving that an action is appropriate for class certification is on the party seeking to represent the class. *See Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir.1974). The class representative need not establish its case on the merits. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). Nevertheless, some preliminary inquiry into the merits may be necessary for an intelligent determination of whether to certify the class. *See Shelton v. Pargo, Inc.,* 582 F.2d 1298, 1312–13 (4th Cir.1978).

### A. *Prerequisites of Rule 23(a)*

#### 1. *Numerosity*

With respect to the numerosity prerequisite of Rule 23(a)(1), the Court adopts its previous findings. 95 F.R.D. at 174–75. The diminution of the proposed class from 96 to 93 unamended bottlers does not now preclude the plaintiff from satisfying the numerosity requirement of Rule 23(a)(1). The remaining prerequisites of Rule 23(a) require further elaboration.

#### 2. *Commonality*

█ Rule 23(a)(2) requires that "common questions of law or fact" be present among all class members. Rule 23(a)(2) requires neither that common issues predominate over individual issues nor that the common issues be dispositive of the case. *See Brown v. Cameron-Brown Co.,* 92 F.R.D. 32, 37 (E.D.Va.1981); *Resnick v. American Dental Ass'n,* 90 F.R.D. 530, 538–39 (N.D.Ill. 1981); 7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1763 (1972 & Supp.1982) [hereinafter cited as "—— Wright & Miller § ——"]. The Fifth Circuit Court of Appeals has stated that the rule "does require that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter,* 669 F.2d 328, 335 (5th Cir.1982).

In the instant case there are common issues of law and fact as to each of the plaintiff's claims. Enforcement of the 1921 Consent Decrees and the Bottler's Contracts, is alleged to be premised, in part, upon the meaning of certain provisions of the Consent Decrees regarding the pricing and composition of Bottler's Syrup. Plaintiff alleges that these provisions were incorporated into all of the Bottler's Contracts and concludes that interpretation of the Consent Decrees is essential to interpreting the Bottler's Contracts.[27] The unjust enrichment claims in Counts I, III and IV are also based, in part, upon the pricing and composition provisions of the Consent Decrees and the Bottler's Contracts. Since resolution of all of these common questions of law and fact will affect all or a significant number of the putative class members, the plaintiff has satisfied the commonality requirement of Rule 23(a)(2).

#### 3. *Typicality*

█ In three counts, the plaintiff essentially has asserted seven claims against the defendant on behalf of the class: two claims of violations of the Bottler's Contracts (Counts I and III); two claims of violations of the 1921 Consent Decrees (Counts I and III); and three claims of unjust enrichment (Counts I, III and IV). Under Rule 23(a)(3), the claims of the representative party must be typical of the claims of the class. While the precise meaning of subsection (a)(3) is not clear, *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 269 (10th Cir.1975), the focus of the rule is upon the alignment of the claims and interests of the class representative and the class members. *Scott v. University of Delaware,* 601 F.2d 76, 85 (3d Cir.1979), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1980). A "class representative must be part of the class and 'possess the

Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia and Wisconsin.

**27.** *See supra* pp. 262–263.

same interests and suffer the same injury' as the class members." *Id.* at 85 n. 19, quoting *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). A representative's claim should be considered typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of the other class members and if the claims of the representative are based on the same legal theory. *Resnick v. American Dental Association,* 90 F.R.D. at 539; 1 H. Newberg, *On Class Actions,* § 1115(b) & (c) (1977 & Supp.1980 & Cumm.Supp.1982); 7 Wright & Miller § 1764. "Where the class representative's claims are such that they will have to prove the same elements as the remainder of the class, then typicality should be found notwithstanding factual differences between various members of the class." *Brown v. Cameron-Brown Co.,* 92 F.R.D. at 38; 1 H. Newberg, *On Class Actions* § 1115(b). One of the functions of Rule 23(a)(3), however, is "to screen out class actions when the legal or factual position of the representative is markedly different from that of other members of the class even though common issues of law or fact are raised." *Brown v. Cameron-Brown Co.,* 92 F.R.D. at 38; 7 Wright & Miller § 1764. An examination of each of the plaintiff's claims indicates that not all of the plaintiff's claims are typical of the claims of the class.

### a) *Bottler's Contract Claims*

■ Although it can be said that all of the proposed class members are proceeding on the same legal theory regarding their contractual claims—that is, breach of contract—the contractual claims of each class member do not appear to be governed by the law of any one state. For example, Elizabethtown is a Kentucky corporation.

Elizabethtown's Bottler's Contract was entered into in 1936 with the Thomas Company, a Delaware corporation with its principal place of business in Tennessee. Under Delaware law, the law governing the construction and enforcement of this contract is most likely that of Tennessee or Kentucky, the states apparently having the most significant interest in the parties and contract. *See Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.,* 394 A.2d 1160, 1166 (Del.1978) (applying *Restatement (Second) Conflicts of Law* § 188 (1971)).[28] The class is composed of ninety-three bottlers from thirty states. The contractual claims of the class will possibly involve the law of thirty states and most certainly more than one. The absence of one uniform law applicable to all of the class members' contractual claims will potentially result in as many separate adjudications as there are states whose law governs the various members' contractual claims. The differing legal position of the plaintiff and that of most other bottlers with respect to the Bottler's Contract claims set forth in Counts I and III precludes finding that any class member's contractual claims are typical of those of the other members of the class.[29] *See* 95 F.R.D. at 177–78.

While the plaintiff's contractual claims are not typical of the class, certain issues relating to these claims are typical. Plaintiff alleges that the meaning of terms in the Bottler's Contracts regarding the composition and pricing of Coca-Cola are derived, at least in part, from the 1921 Consent Decrees. Many of these contracts were entered into immediately after entry of the Consent Decrees as final judgments. The Consent Decree entered in Case No. 389 was "conditioned [in part] upon the consent of the actual bottlers to the modification of

28. *See Process and Storage Vessels, Inc. v. Tank Service, Inc.,* 541 F.Supp. 725, 729 (D.Del. 1982); *Sellon v. General Motors Corp.,* 521 F.Supp. 978, 981–82 (D.Del.1981) (both cases found that Delaware has adopted § 188 of the Restatement (Second) Conflict of Laws).

29. Most significantly, differing state laws concerning parol evidence and assignments render generalized proof of plaintiff's contractual claims impracticable if not impossible. Most of the Bottler's Contracts were entered into prior to the adoption of the Uniform Commercial Code in most states and, therefore, are not governed by the uniform provisions of the Code. *See, e.g.,* 6 *Del.C.* § 10–101. Moreover, the creation of 30 sub-classes pursuant to Rule 23(c)(4) is impractical.

their contracts with [the Whitehead Co.] in accordance with the terms of this agreement." (Doc. 111, Ex. H, ¶ 15).[30] Similarly, after entry of final judgment in Case No. 388, the Thomas Co. incorporated the modifications of the Consent Decrees into the Bottler's Contracts. (See Doc. 110, Ex. A at A–1–a). Moreover, most, if not all, Bottler's Contracts state that the bottler is assigned certain rights and privileges from its parent bottler—the Thomas Co. or the Whitehead Co.—that the parent originally received from Coca-Cola in a series of contracts, including the Consent Decrees, during the period between 1899 and 1921. (See, e.g., Doc. 110, Ex. A). Therefore, interpretation of relevant provisions regarding the pricing and composition of the 1921 Consent Decrees will likely be necessary in determining the meaning of similar provisions in the Bottler's Contracts.[31] Interpretation of the Consent Decrees will, in all probability, be relevant to most, if not all, class members in pursuing their claims on their Bottler's Contracts.

Problems arising as to the typicality of representative claims can be dealt with under Rule 23(c)(4)(A). 7A Wright & Miller § 1764. Pursuant to Rule 23(c)(4)(A), the Court may, when appropriate, allow an action to be maintained with respect to particular issues, as long as the other provisions of Rule 23 are satisfied. *Arthur Young & Co. v. United States District Court,* 549 F.2d 686, 692 (9th Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977).

The theory of Rule 23(c)(4)(A) is that the advantages and economics of adjudicating issues that are common to the entire class as a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member. Accordingly, even if only one common issue can be identified as appropriate for class action treatment, that is enough to justify application of the provision as long as the other Rule 23 requirements have been met. 7A Wright & Miller § 1790 at 189.

The nexus between the Consent Decrees and each unamended bottler's Bottler's Contract indicates that the interpretation of the decrees will affect most, if not all, members of the putative class. These issues of interpretation are not so inextricably intertwined with individual issues that they cannot be fairly and effectively adjudicated separately without reference to factual or legal issues pertaining only to the claims of individual class members. *See Windham v. American Brands, Inc.,* 565 F.2d 59, 71–72 (4th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *Arthur Young & Co. v. United States District Court,* 549 F.2d at 693.

Treatment of these common issues in a class action will advance "the efficiency and economy of litigation which is the principal purpose of the procedure." *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 159, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982) (*quoting American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 553, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974). Separate adjudication of these common issues that are central to the claims of class members will enable the Court to dispose of these issues in one efficient procedure where only the class representatives will actively participate. Although this Court will most likely deal with the individual issues facing many of the unamended bottlers, this is not a result of the certification of these common issues but of the permissive intervention of certain unamended bottlers in the Elizabethtown case. Rather than address these issues with some unamended bottlers present as intervenors, the interests of efficiency and economy of litigation will be better served by one adju-

---

**30.** If Whitehead could not obtain the consent of all bottlers by September 1, 1921, the Consent Decrees provided that the parties to the decree would agree to another plan of procedure. Doc. 110, Ex. H, ¶ 16. *See supra* note 15. *See*

*also* Doc. 110, Ex. I, Letter dated July 25, 1921 from the Whitehead Co. explaining settlement with Coca-Cola.

**31.** *See supra* p. 262.

dication that will affect all unamended bottlers as to these common issues.[32]

The Bottler's Contract claims in Counts I and III will be afforded class treatment only with respect to the issue of interpretation of the relevant portions of the Consent Decrees.[33] Pursuant to Fed.R.Civ.P. 42(b), trial of what remains of the plaintiff's claims will be tried separately from the issues of the meaning of the 1921 Consent Decrees. The other members of the class will be required to proceed individually in independent proceedings or by intervening in the Elizabethtown case on all other issues with respect to claims arising from their Bottler's Contract and the Consent Decrees.[34] *See Nix v. Grand Lodge of the International Association of Machinists and Aerospace Workers,* 479 F.2d 382, 385–86

(5th Cir.), *cert. denied,* 414 U.S. 1024, 94 S.Ct. 449, 38 L.Ed.2d 316 (1973).

### b. *Consent Decree Claims*

At first glance, the claims under the Consent Decrees appear to be typical of the class. The claims under the Consent Decrees arise from Coca-Cola's allegedly common course of conduct in pricing and manufacturing syrup for the unamended bottlers. In addition, the claims are premised upon the same legal theory—violation of the terms of the Consent Decrees. The class representative will have to prove essentially the same facts as to the meaning of the provisions of the Consent Decrees and whether the substitution of fructose for granulated sugar and the pricing of syrup on the basis of the list price and not the actual cost of syrup violate the decrees.

**32.** Since a class action will be maintained only with respect to these common issues, class members desiring to pursue claims against the Coca-Cola Co. will have to initiate separate proceedings or seek to intervene in the Elizabethtown case on the issues which will not be certified.

**33.** Pursuant to Rule 23(c)(4)(A) a class action will be maintained only with respect to issues involving interpretation of the 1921 Consent Decrees:

(1) Issues under paragraph 10 of the 1921 Consent Decrees which provides:

10. The [Coca-Cola Company] contracts that the syrup sold and furnished by it to the [Coca-Cola Bottling Company, plaintiff's parent bottler and assignor] is to be high grade standard Bottlers Coca-Cola Syrup and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

The Court will determine (A) the meaning of the word "sugar" as used in paragraph 10 of the Consent Decrees entered by the Court on October 4, 1921 in *Coca-Cola Bottling v. The Coca-Cola Company,* Equity Case No. 388, and *The Coca-Cola Bottling Company v. The Coca-Cola Company,* Equity Case No. 389, and (B) whether the word "sugar" as used in paragraph 10 of the 1921 Consent Decrees includes High Fructose Corn Syrup-55.

(2) Issues under paragraph 7 of the 1921 Consent Decrees which provides:

7. It is agreed between the parties that the price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refin-

eries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

The Court will determine whether the term "market price" as used in paragraph 7 means the actual prices at which the relevant "refineries" were selling standard granulated sugar to Coca-Cola or the "list" price at which the refineries were selling standard granulated sugar, irrespective of the price Coca-Cola actually paid for such sugar.

**34.** Unamended bottlers seeking to adjudicate these remaining issues will be required to intervene in C.A. No. 81–48 or to initiate an independent suit in this or another forum. *See infra* p. 279. As to the issues not certified for class treatment, any statute of limitations applicable to those individual claims and issues will not be tolled by the certification of subclasses on these common issues. The defendant, Coca-Cola, however, has waived, for all unamended bottlers who have not as yet sought to intervene in C.A. No. 81–48, any statute of limitations defense arising from the expiration of any applicable statute of limitations between the filing of Elizabethtown's complaint on February 4, 1981 and sixty days from the date of the Court's approval of the class representatives' form of notice to the class members. *See infra* note 64. Any diverse unamended bottlers may intervene prior to the expiration of this sixty-day period. Problems arising from potential conflicts among Thomas Bottlers, Whitehead Bottlers or bottlers of subparents of Thomas and Whitehead will be dealt with by the creation of subclasses pursuant to Rule 23(c)(4)(B). *See infra* p. 270 & note 40.

Finally, unlike plaintiff's contractual claims, claims arising directly from the 1921 Consent Decree would appear to be governed by the law of one state—Delaware.[35]

The initial determination of whether the complained of conduct of Coca-Cola is violative of the Consent Decrees is capable of class wide determination. However, the determination of whether Coca-Cola is ultimately liable to an individual unamended bottler for violation of the 1921 Consent Decrees will largely depend on sixty years of dealing with Coca-Cola which includes each bottler's individual course of dealing with Coca-Cola under their own Bottler's Contract. This aspect of plaintiff's claims against Coca-Cola for violations of the 1921 Consent Decrees cannot be considered typical of the class for the same reason that the Bottler's Contract claims are not typical. As with the claims of the individual Bottler's Contracts, a uniform law will not govern all aspects of these claims. The markedly differing factual and legal positions of each class member preclude finding that plaintiff's Consent Decree claims are typical of the class.

However, as with the Bottler's Contract claims, the claims under the Consent Decrees present common issues with respect to the meaning of the relevant provisions of the decrees.[36] These issues are identical to those issues found to be typical of the plaintiff's Bottler's Contract claims.[37] Therefore, pursuant to Rule 23(a)(4)(A), the action will be maintained as a class action with respect to the common issues raised by plaintiff's claims under the Consent Decrees, if the other requirements of Rule 23 are satisfied as will be discussed *infra* at 270–274. Pursuant to Rule 42(b), the remaining aspects of Elizabethtown's claims against Coca-Cola will be tried separately. Again, class members will either have to seek to intervene in the Elizabethtown case or proceed independently in the remaining aspects of their claims against Coca-Cola.[38]

### c.  *Unjust Enrichment Claims*

Plaintiff has asserted three claims of unjust enrichment. The claims in Counts I and III are pled in the alternative. Plaintiff will assert these claims only if the claims on the Bottler's Contract and Consent Decrees fail. Plaintiff plans to proceed on Count IV simultaneously with the Bottler's Contract and Consent Decree claims of Counts I and III. At this time, the Court is unable to determine whether plaintiff's unjust enrichment claims are typical of the claims of the other class members. The plaintiff has not presented a legal theory underlying these claims in sufficient detail for the Court to determine whether the claims of the proposed representative and of the class members are based upon the same legal theory. More importantly, without knowing the contours of the plaintiff's legal theory, the Court cannot determine whether the claims of the representative will be governed by the same law as the claims of the class members or if the representative's claims are such that the representative will have to prove the same elements as the remainder of the class in order to prevail. Therefore, the Court will not certify the proposed class with respect to plaintiff's claims for unjust enrichment in Counts I, III and IV.

### 4.  *Adequacy of Representation*

■  Finally, Rule 23(a)(4) requires the class representative to fairly and adequately protect the interests of the class. Under the rule, the class representative must assure that the case will be prosecuted vigorously and that no potential conflicts exist between the class representative and other members of the class. *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *see Brown v. Cameron-Brown Co.,* 92 F.R.D. at 40–41; 1

---

**35.** Under the *Restatement (Second) Conflicts of Law* § 188, Delaware appears to have the most significant interest in claims arising under the Consent Decrees. *See supra* p. 266 & note 22.

**36.** *See supra* pp. 266–267.

**37.** *See supra* note 33.

**38.** *See infra* pp. 279–282 & *supra* note 34.

H. Newberg, *On Class Actions* § 1120(a). The Court adopts its original finding that Elizabethtown will be able to vigorously prosecute the case. 95 F.R.D. at 178–79.

■ However, the plaintiff cannot satisfy the second element of the test. Any rights of Elizabethtown against Coca-Cola derive, in part, from Elizabethtown's earlier contractual relationship with the Thomas Co. Not all of the members of the proposed class were Thomas Bottlers. Many of the class members were Whitehead Bottlers. A third group of bottlers derived their rights from contractual relationships with subsidiaries of the Thomas or Whitehead companies.

The differences in the origin of these three groups of bottlers may be significant in determining the nature and extent of the bottler's rights under their individual Bottler's Contracts and the Consent Decrees. The Court, with the assistance of the parties, may restructure the class, pursuant to Rule 23(c)(4)(B),[39] to eliminate obstacles to class certification. *United States Parole Commission v. Geraghty,* 445 U.S. 388, 407–08, 100 S.Ct. 1202, 1214, 63 L.Ed.2d 479 (1980); 7A Wright & Miller § 1765. The potential differences between Elizabethtown and other members of the class can be eliminated by dividing the class into three or more subclasses, represented by an appropriate bottler. Elizabethtown would represent the Thomas Bottlers. Shreveport, who seeks to represent the Whitehead bottlers in Case No. 389, appears to be an appropriate representative of the Whitehead Bottlers assuming it would represent the class vigorously. Similarly and if necessary, one or more class representatives could be found to represent the other bottlers not directly related to Whitehead or Thomas.

In sum, the plaintiff has satisfied the prerequisite of Rule 23(a)(4) subject to certain conditions. Plaintiff will be given an opportunity to propose a representative or representatives for these bottlers not directly related contractually to either Thomas or Whitehead. Defendant will also be given an opportunity to object to Shreveport as the representative of the Whitehead bottlers and to the representatives proposed by the plaintiff to represent any other necessary bottler subclasses.[40]

### B. *Class Actions Maintainable—Rule 23(b)*

The plaintiff has satisfied the prerequisites of Rule 23(a) for each subclass as to particular issues arising from interpretation of the 1921 Consent Decrees as these issues relate to the interpretation of each bottler's Bottler's Contract and to the enforcement of the 1921 Consent Decrees.[41] The plain-

---

**39.** Rule 23(c)(4)(B) states:

· When appropriate ... a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.

**40.** Plaintiff argues that only two subclasses are necessary, one class of Thomas Bottlers and one class of Whitehead Bottlers. Plaintiff seeks to include bottlers of the two Whitehead subsidiaries—The Coca-Cola Bottling Co. (1903) and the Western Coca-Cola Bottling Co.—within the class of Whitehead Bottlers. Defendant, Coca-Cola, seeks to have a third subclass consisting of bottlers whose exclusive territories are located in the territory assigned as of October 4, 1921 to The Coca-Cola Bottling Co. (1903). The Court requests that the parties attempt to reach agreement on the necessity of additional subclasses. If unable to do so, each party should submit a brief letter memorandum stating the reasons for its position on additional subclasses and if they cannot agree, the parties shall also state their respective positions on proposed class representatives.

**41.** Rule 23(c)(4) provides that an action may be maintained as a class action with respect to particular issues and subclasses and that the provisions of Rule 23 shall then be construed and applied accordingly. The action as structured by the Court clearly satisfies the prerequisites of Rule 23(a)(2), (3) and (4). Although the size of the subclasses will be approximately half the size of the entire number of unamended bottlers, the subclasses satisfy the numerosity requirement of Rule 23(a)(1). Joinder of all of the former Thomas Bottlers and of all the former Whitehead Bottlers is impracticable. *See supra* p. 265; 1 H. Newberg, *On Class Actions* § 1105(d). Although any diverse unamended bottler will be permitted to intervene in the Elizabethtown case, C.A. No. 81–48, it is unlikely that all or even a majority of them will do so. Adjudication of the common issues of interpretation of the Consent Decrees will af-

tiff must additionally satisfy one of the three requirements of Rule 23(b)[42] for the Court to certify subclasses composed of unamended bottlers for each of the issues of interpretation of the relevant provisions of the 1921 Consent Decrees.

### 1. *Rules 23(b)(1)(A) and 23(b)(2)*

This action, as limited to particular issues, cannot be certified under Rule 23(b)(1)(A) or 23(b)(2). Resolution of the meaning of paragraphs ten and seven of the Consent Decrees in separate adjudications, without more, will not establish incompatible standards of conduct for defendant, Coca-Cola, as required by Rule 23(b)(1)(A). The mere resolution of these issues in favor of one bottler would not require Coca-Cola to do anything even if such a determination might eventually lead to a finding that Coca-Cola may have to provide syrup made only with granulated sugar to one bottler and syrup made with granulated sugar and fructose to another. In other words, interpretation of the Consent Decrees will not result in incompatible standards of conduct for Coca-Cola. *See* 7A Wright & Miller § 1773. Similarly, although Coca-Cola appears to have acted on grounds generally applicable to the class, final injunctive relief or corresponding declaratory relief

would not appropriately result from adjudication of these particular issues of interpretation. *See* Rule 23(b)(2). Determination of these issues would not result in corresponding declaratory relief that would have the effect of enjoining the defendant from acting in the future. *See* 7A Wright & Miller § 1775 at 22. Final injunctive relief will be appropriate for each class member only after resolution of the many individual issues facing each class member regarding Coca-Cola's duties under the Consent Decrees and the Bottler's Contract of each unamended bottler.

### 2. *Rule 23(b)(1)(B)*

Under Rule 23(b)(1)(B) a class action is maintainable where the adjudication of separate actions would, as a practical matter, be dispositive of the interests of the other class members or substantially impair or impede their ability to protect their interests:

> This clause takes in situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual action would lie in the fact that the other mem-

---

fect all unamended bottlers whether they intervene or not. These common issues should be resolved in one class proceeding for all unamended bottlers rather than in one case or consolidated cases with thirty or more participants.

**42.** Rule 23(b) provides:

> (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

bers of the class, thus practically concluded, would have had no representation in the lawsuit.

Rule 23(b)(1)(B) Advisory Committee Notes, 39 F.R.D. 73, 100–01 (1966).

Plaintiff argues that, even if a ruling in favor of Coca-Cola on the issues to be certified is not technically binding on any unamended bottler other than the plaintiff, a well reasoned decision on the merits in favor of Coca-Cola will, as a practical matter, be dispositive of the identical claims of the class. The Court's ruling would, at the very least, be a formidable precedent which, under the principles of *stare decisis,* will likely be accepted as persuasive by any other court that is called upon to consider the same issues. Moreover, plaintiff argues that a decision of Elizabethtown's claims would likely bind most, if not all, class members under the doctrine of *res judicata* or collateral estoppel since the class members have made financial contributions to support Elizabethtown's prosecution of this case and have generally controlled the litigation. Defendant, Coca-Cola, argues that the majority view is that a *stare decisis* effect, even if it should exist, is not enough to warrant certification of a class action. Rule 23(b)(1)(B).

Defendant correctly argues that a majority of courts hold "that the mere *stare decisis* effect of an individual adjudication is not ordinarily enough as a practical matter to be dispositive of other members' interest, and that a dispositive impact more in the nature of a legal necessity traceable to a joint or common right, such as disposition of a property interest which could not subsequently be recaptured, or one of the other recognized impacts is what is required." 3B J. Moore, *Federal Practice* ¶ 23.35[2] (1982 & Supp.1981–82); *see Larionoff v. United States,* 533 F.2d 1167, 1181 n. 36 (D.C.Cir. 1976), *aff'd on other grounds,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 467 (9th Cir.1973). Rule 23(b)(1)(B) is often

applied where the members of a class each have rights in a common organization, fund or contract which ought to be adjudicated together in order to avoid unfair legal or practical advantage by one class member over another. *Rodriguez v. Family Publication Service, Inc.,* 57 F.R.D. 189, 192–93 (C.D.Ca.1972).

Other courts and commentators, however, have acknowledged an exception to this general rule. 3B J. Moore, *Federal Practice* ¶ 23.35[2]; 7A Wright & Miller § 1774; 1 H. Newberg, *On Class Actions* § 1140(a). In *Amalgamated Workers Union of the Virgin Islands v. Hess Oil Virgin Islands Corp.,* 478 F.2d 540, 544 (3d Cir.1973), the Third Circuit Court of Appeals stated that a class action could possibly be maintained under Rule 23(b)(1)(B) where four union members alleged that defendant violated local labor laws by requiring employees to work rotating shifts without overtime compensation. The Court stated that:

We think subsections (b)(1) and (2) might well apply to this suit because wage and hour litigants in the Virgin Islands would in the future, under the decision of the district court, have to press claims with the Commissioner of Labor, and any adjudication of the merits would establish a precedent applicable to all.

*Id.* In *Berman v. Narragansett Racing Ass'n, Inc.,* 48 F.R.D. 333, 337 (D.R.I.1969), the court allowed a class action to be maintained under 23(b)(1)(B) where an individual action would establish defendant's liability on a general contract so that a ruling would have the effect of disposing of the claims of others similarly situated if other courts were persuaded by the first ruling. *See Eliasen v. Green Bay & Western Railroad Co.,* 93 F.R.D. 408, 412–13 (E.D.Wis. 1982); *Lynch Corp. v. MII Liquidating Co.,* 82 F.R.D. 478, 482–83 (D.S.D.1979).

Although the *stare decisis* effect of the separate adjudication of Elizabethtown's case would not necessarily bind other unamended bottlers,[43] the unique circum-

---

**43.** The Court cannot determine the preclusive effect upon other unamended bottlers of a judgment in this case if Elizabethtown were the

only party. However, under expanding concepts of associational and virtual representation, *see* 18 Wright, Miller & Cooper §§ 4451,

stances of this case indicate that other courts will most likely rely upon this Court's interpretation of the 1921 Consent Decrees in future cases. The decrees are prior judgments of this Court. The power to interpret a prior judgment is within the inherent equitable powers of the Court issuing the judgment. *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); *Root v. Woolworth*, 150 U.S. 401, 410–11, 14 S.Ct. 136, 138, 37 L.Ed. 1123 (1893).[44] Moreover, the legal interests of Elizabethtown and the unamended bottlers are identical with respect to the meaning of the relevant provisions of the 1921 Consent Decrees. Although each bottler may not be able to rely upon the decrees to the same extent as another bottler,[45] all bottlers seek a favorable interpretation of the decrees.

Perhaps more importantly, there are no factual differences among the unamended bottlers that will require individualized interpretations of the 1921 Consent Decrees.[46] The decrees will have the same meaning for all parties. The total absence of individual issues of law or fact warrants maintenance of an action under Rule 23(b)(1)(B) as opposed to Rule 23(b)(3). *See Al Barnett & Son, Inc. v. Outboard Marine Corporation*, 64 F.R.D. 43, 53 (D.Del.1974). "In such situations, the stare decisis effect of a judgment with respect to the claim of one individual is likely to have a compelling impact on future litigation by persons similarly situated, since no real individual issues exist to distinguish the earlier precedent." 1 H. Newberg, *On Class Actions*, § 1140(a) at 239. Where a class is homogeneous, allowing members to opt out under Rule 23(b)(3) and thereby not be bound by the judgment would permit the institution of separate litigation on these common issues and would defeat the fundamental objective of binding the class with one conclusive adjudication. *See Kyriazi v. Western Electric Co.*, 647 F.2d 388, 393 (3d Cir.1981). The "procedural protections of (b)(3), opting out and notice, are necessary because of the heterogeneity of the (b)(3) class." *Id.* As constructed by the Court, these protections are unnecessary for the class of unamended bottlers whose interests are homogeneous as to the issues of interpretation of the 1921 Consent Decrees.

Finally, the test set out under Rule 23(b)(1)(B) is similar to that in the rule on intervention, Fed.R.Civ.P. 24(a)(2), regarding impairment of interest. *Eliasen v. Green Bay & Western Railroad Co.*, 93 F.R.D. at 412 n. 2. Rule 24(a)(2), in relevant part, allows intervention where a party is "so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest." "[S]everal courts have held that the stare decisis effect may, in a proper case, supply the practical disadvantage that is required for intervention under Rule 24(a)(2)." 7A Wright & Miller § 1908; *see Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission*, 578 F.2d 1341, 1345 (10th Cir.1978); *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C.Cir.1967); *Atlantis Development Corp. v. United States*, 379 F.2d 818, 824–27 (5th Cir.1967). As stated in *Jet Traders Investment Corp. v. Tekair, Ltd.*, 89 F.R.D. 560, 569 (D.Del. 1981):

Intervention of right has been granted in some actions ... where the *stare decisis* effect of the first action would be its sole effect upon the proposed intervenor's ability to protect its interest. The practical impairment test is not met, however, in every case where there might be some possibility that the decision in that action

---

44. *See infra* p. 275.

45. For example, older bottlers may be in a better position to rely on the 1921 Consent Decrees in interpreting their own Bottler's Contracts than bottlers who entered into Bottler's Contracts in recent years.

4456 & 4457, other courts may find that the participation and support of Elizabethtown by non-party unamended bottlers warrants binding those bottlers as if they were parties.

46. Although each bottler may not be entitled to rely upon the decrees to the same extent, the differing factual positions of the class members will not affect the determination of what the Consent Decrees meant as of 1921.

would have an effect by virtue of *stare decisis* on a subsequent suit that might be brought by the proposed intervenor. Certain additional exceptional circumstances must be present which would give the decision in the first action compelling persuasive force in the second.

While Rule 23(b)(1)(B) differs from Rule 24(a)(2) in that Rule 23 requires that the non-participants' interests "would" rather than "may" be impaired, the cases analyzing the dispositive effect of *stare decisis* in the context of intervention are relevant to applying Rule 23(b)(1)(B). This is especially true in a case of first impression, as is this case, and where *stare decisis* is considered in the context of a court interpreting its own Consent Decrees. *See Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission,* 578 F.2d at 1345; *Nuesse v. Camp,* 385 F.2d at 702; *Atlantis Development Corp. v. United States,* 379 F.2d at 825 (*stare decisis* found to pose a sufficient impairment where there is presented to the court a question of first impression on a controlling issue of law).

■ Given the unique facts of this case: (1) the identity of interests of all unamended bottlers in interpreting the relevant provisions of the Consent Decrees, (2) the general applicability of the Consent Decrees to all unamended bottlers, (3) the common factual setting and (4) issues of first impression before a court construing its own decrees, the disposition of these issues in a suit involving only Elizabethtown would as a practical matter be dispositive of these issues in subsequent actions by unamended bottlers. Therefore, as to the particular issues of interpretation of relevant portions of the Consent Decrees, the action should be maintained as a class action under Rule 23(b)(1)(B).[47] Pursuant to Rule 23(d)(2) plaintiff will be directed to send notice to all unamended bottlers stating, as will be more fully described in the Court's order, (1) the issues the Court has certified, (2) the binding effect of the Court's determination of these issues, (3) and that any class member may, if it desires, enter an appearance through its counsel.

### III. *Shreveport's Motion to File a Supplemental Complaint in Case No. 389*

Shreveport, a signatory to the consent order entering the Settlement Agreement between the Whitehead-Lupton Co. and Coca-Cola as a final judgment in Case No. 389 (the "Whitehead Consent Decree"), has moved to file a supplemental complaint in that case. The complaint (Doc. 111) is substantially similar to that of Elizabethtown in C.A. No. 81–48. (Docs. 1 & 55). Shreveport alleges on its own behalf and that of all other unamended bottlers that Coca-Cola has violated the Whitehead Consent Decree and each unamended Whitehead Bottler's Contract by substituting fructose for granulated sugar in Bottler's Syrup and by basing the price of syrup on the list price rather than the actual cost of sugar. Shreveport also has asserted the same three claims of Elizabethtown for unjust enrichment.

Shreveport maintains that under Fed.R. Civ.P. 15(d)[48] the Court should allow the filing of the supplemental complaint and points out that a court has jurisdiction to carry into effect its own orders, decrees and judgments. Relying upon *Root v. Wool-*

---

47. While the plaintiff could also satisfy subsection (b)(3), the Third Circuit Court of Appeals has held that when an action is maintainable under Rule 23(b)(1) or (b)(3), the case should ordinarily be certified under (b)(1) to maximize the binding effect of a court's determination. *Kyriazi v. Western Electric Co.,* 647 F.2d 388, 393 (3d Cir.1981); *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 252–53 (3d Cir.1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

48. Rule 15(d) states:

Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense. If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefor.

*worth,* 150 U.S. at 411, 14 S.Ct. at 138, Shreveport argues that a party, or its assignee or successor, to a consent decree should be allowed to file a supplemental complaint after a decree so that the decree may be carried fully into execution. Shreveport concludes that a party to a judgment should not be put to the necessity of instituting an original or independent suit for enforcement of a decree. (Doc. 143 at 3–5).

Defendant, Coca-Cola, argues that while the Court retains technical jurisdiction over the 1921 Whitehead Consent Decree, Shreveport is not entitled to file a supplemental complaint sixty years after entry of the decree. It is argued that leave to file a supplemental complaint after entry of a final decree should be denied when the pleading could have the effect of reopening a settled case or where the matters alleged in the supplemental complaint could be the subject of a separate action.[49]

█ The power of a court to interpret, modify or enforce a final consent decree is inherent in the jurisdiction of the court and is not dependent upon an explicit reservation of jurisdiction in a final order or decree when the subject matter and the parties are the same in both proceedings. *United States v. Swift & Co.,* 286 U.S. at 114, 52 S.Ct. at 462; *Root v. Woolworth,* 150 U.S. at 410–411, 14 S.Ct. at 138; *see United States v. New York Telephone Co.,* 434 U.S. 159, 188, 98 S.Ct. 364, 380, 54 L.Ed.2d 376 (1977) (Stevens, J., dissenting in part); *Sarabia v. Toledo Police Patrolman's Ass'n,* 601 F.2d 914, 919 (6th Cir.1979). A party may return to the court issuing a decree, for the purpose of enforcing the decree. *Society Hill Civic Ass'n v. Harris,* 632 F.2d 1045, 1052 (3d Cir.1980).

█ A supplemental complaint may be filed after entry of a decree in order to carry the decree fully into execution. *Root v. Woolworth,* 150 U.S. at 411, 14 S.Ct. at 138. Where "a supplemental bill is brought in aid of a decree, it is merely to carry out and to give fuller effect to that decree, and not to obtain relief of a different kind on a different principle; . . . . [A party] should not . . . be put to the necessity of instituting an original or independent suit . . . and relitigate the same questions which were involved in the former proceeding." *Id.*

█ Defendant argues that Shreveport's supplementary complaint raises questions which were not involved in the 1921 litigation between Coca-Cola and the Whitehead Co. The defendant is correct in that Shreveport's complaint goes well beyond the reach of the 1921 Consent Decree. Shreveport not only seeks to enforce the decrees but also raises claims with respect to its own Bottler's Contract and that of each unamended bottler. While the parties to the Consent Decree contemplated that Whitehead would modify the contracts with its actual bottlers in accordance with the decree, it cannot be said that questions arising from those contracts were involved in the 1921 litigation. Similarly, the unjust enrichment claims set forth in Counts I, II and IV are only tangentially related to the Whitehead Consent Decree. Shreveport has not alleged that recovery on these unjust enrichment claims arises from Coca-Cola's alleged violation of the decree but rather from the alleged inequity of paying for syrup, the price of which is based upon the price of granulated sugar when a less expensive sweetner, fructose, is being used or when the price charged for syrup is not based upon the price actually paid by the defendant for granulated sugar based upon

**49.** Defendant also argues that pursuant to Fed. R.Civ.P. 86(a) the plaintiff's motion to file a supplemental complaint should be governed by former Equity Rule 34 and not Fed.R.Civ.P. 15(d). Equity Rule 34 provided that "the court . . . may permit . . . a supplemental pleading, alleging material facts occurring after his former pleading, or of which he was ignorant when it was made . . . ." 3 Moore, *Federal Practice* ¶ 15.16[1]. Rule 86(a) provides that

the Federal Rules of Civil Procedure apply to actions brought after September 1, 1938 and to matters pending on that date. While the defendant's argument is meritorious, the Court need not decide the issue as defendant concedes that Equity Rule 34 is substantially similar to the present Rule 15(d) and application of either rule would lead to a similar result. (Doc. 121 at 25 n. 15).

the refiners "list" price.[50] Therefore, Shreveport cannot file a supplemental complaint alleging violations of its Bottler's Contract in Counts I and III nor the unjust enrichment claims in Counts I, III and IV.

However, Shreveport's claims alleging violations of the Whitehead Consent Decree set forth in Counts I and III do involve questions which were involved in the former proceeding. Defendant's response that questions concerning the sugar content and pricing of Bottler's Syrup were not the subject of the 1921 litigation is incorrect. Defendant fails to distinguish between the subject matter of the 1921 complaint and the content of the ultimate Consent Decree. The 1921 Consent Decree established certain rights between Whitehead and Coca-Cola regarding the manufacture and pricing of Bottler's Syrup.[51] As a signatory to the consent judgment allowing entry of the Settlement Agreement between Coca-Cola and Whitehead, Shreveport relinquished its right to continue its suit as an intervenor against Coca-Cola. This relinquishment warrants that Shreveport be able to seek to have the 1921 Consent Decree, which incorporates the Settlement Agreement, enforced. More importantly,

> [I]f the parties were free to ignore a court judgment or order, the court's ability to perform its duties would be undermined. And the court's power to issue an order requiring a party to carry out the terms of the original judgment is well settled.

*United States v. New York Telephone Co.,* 434 U.S. at 188, 98 S.Ct. at 380 (Stevens, J.,

dissenting in part); *see* All Writs Act, 28 U.S.C. § 1651(a).

Under Rule 15(d) and Equity Rule 34, the grant of leave to file a supplemental complaint is within the discretion of the district court. *Owens-Illinois, Inc. v. Lake Shore Land Co., Inc.,* 610 F.2d 1185, 1188–1189 (3d Cir.1979). Although Shreveport could be granted leave to file a supplemental complaint in Case No. 389 to enforce the decree, the unique circumstances of this case preclude granting such leave.[52] As discussed in Part III, *infra* p. 279, Shreveport will be allowed to intervene in the Elizabethtown case, C.A. No. 81–48, and to file an intervenor's complaint that is identical to the supplemental complaint sought to be filed in Case No. 389. Since Shreveport will be permitted to intervene and file its supplemental complaint in C.A. No. 81–48, there is no reason to have the same supplemental complaint filed in Case No. 389. Further complication of this already procedurally complex case will be avoided whenever possible as long as the rights and interests of the parties are not prejudiced. The denial of Shreveport's motion to file a supplemental complaint in a sixty-year old case will not be prejudicial, in that, Shreveport will be able to enforce the decree as an intervenor in C.A. No. 81–48 before the same Court that issued the 1921 Consent Decree.[53] Moreover, by adjudicating all of Shreveport's claims the Court will be able to avoid piecemeal litigation of the dispute. Therefore, the motion for leave to file a supplemental complaint in Case No. 389 will be denied.[54]

---

**50.** *See supra* pp. 261–262, 263.

**51.** *See supra* p. 259 & note 14.

**52.** It is not clear that Shreveport would be able to seek damages for the defendant's alleged breach of the Consent Decree. The relief granted by an order to enforce judgment may not be "of a different kind" or "on a different principle" from that accorded by the underlying order or judgment. *U.S. v. N.Y. Telephone Co.,* 434 U.S. at 188, 98 S.Ct. at 380 (Stevens, J., dissenting). In light of the court's decision to deny leave to file a supplemental complaint, the Court need not decide this issue.

**53.** Shreveport's concern that enforcement of the Consent Decrees in a collateral proceeding

is precluded by recent decisions in the Third Circuit Court of Appeals is unfounded. *Society Hill Civil Ass'n v. Harris,* 632 F.2d at 1051–52, and *Oburn v. Shapp,* 70 F.R.D. 549 (E.D.Pa.), *aff'd without opinion,* 546 F.2d 418 (3d Cir. 1976), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977), dealt with collateral attacks by nonparties upon a consent decree and not an attempt of a party to enforce a decree. Moreover, Shreveport will be before the Court that entered the decree as final judgment.

**54.** The reopening of Case No. 389 presents another problem. Certain Coca-Cola bottlers, some of which are involved in C.A. No. 81–48, have filed other suits against Coca-Cola in this

## IV. *Intervention and Consolidation*

Three motions to intervene are presently before the Court: 1) a motion by former Whitehead bottlers [55] other than Shreveport to intervene in Case No. 389—the Whitehead litigation—seeking interpretation and enforcement of the same 1921 agreement and decree; 2) a motion by Elizabethtown and other Thomas bottlers [56] to intervene in Case No. 388—the Thomas litigation—seeking interpretation and enforcement of the 1921 settlement agreement and consent judgment; and 3) a motion by bottlers from the former Whitehead territory, including Shreveport, and bottlers from the former Thomas geographic area to intervene [57] in the current Elizabethtown suit, C.A. No. 81–48, to assert the three counts of the Elizabethtown amended complaint on behalf of each intervenor and on behalf of all unamended bottlers. Assuming success in the intervention motions, plaintiff and proposed intervenors then propose to file supplemental intervenors' complaints in each case and to consolidate the two 1921 cases with the current litigation.

### A. *Intervention in Case No. 388 and Case No. 389*

█ In order to comprehend plaintiff and proposed intervenors' desire to intervene in ancient and long closed litigation, the current procedural setting must be fully understood. Elizabethtown's complaint was drafted and plaintiff proceeded on the theory that the bottlers had unquestioned standing to enforce the 1921 decrees. When this Court held as an alternative basis for its denial of class action certification that Eliz-

abethtown did not have standing to enforce the Thomas Consent Decree, 95 F.R.D. at 177, it triggered a spate of procedural motions including this effort of plaintiff and proposed intervenors to intervene in the long closed 1921 litigation. Those efforts have understandably persisted even though the Court announced it would, and since has withdrawn the ruling as inappropriate in the procedural context, unnecessary to the class certification decision, and ill timed. *See supra* pp. 264–265. In short, the motions to intervene in the 1921 litigation were spawned primarily as an effort to alleviate concerns about bottlers' standing to enforce the 1921 decrees. It is against this procedural background that attention is turned to the merits of intervention in litigation which, while on appeal, was settled by consent decree in 1921.

Intervention in a federal court suit is governed by Fed.Rule Civ.P. 24. Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely.' If it is untimely, intervention must be denied. Thus, the court where the action is pending must first be satisfied as to timeliness. Although the point to which the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive. Timeliness is to be determined from all the circumstances. And it is to be determined by the court in the exercise of its sound discretion; unless that discretion is

Court. These plaintiffs claim that Coca-Cola has violated the 1921 Consent Decrees and the Bottler's Contracts by introducing "diet Coke," a new diet soft drink. In these new actions, C.A. Nos. 83–95 and 83–120 (D.Del.1983), plaintiffs seek to intervene and to file supplemental complaints in Case No. 389. However intriguing the procedural maneuverings of the plaintiffs might be in these cases, the Court must focus upon a prompt, efficient and just resolution of the substantive claims presented. The allowance of an unnecessary filing of a supplemental complaint in Case No. 389 that is identical to the complaints before the Court in C.A. No. 81–48, a case in which Shreveport is an intervenor, may eventually envelop the

Court in an unmanageable procedural nightmare where two extremely complex cases become consolidated into one along with Case No. 389. Without a strong showing of necessity, the Court will not reopen a sixty-year old case where the claims sought to be asserted are already present in an active case before the Court that issued the original decree.

**55.** *See supra* note 3.

**56.** *See supra* note 2.

**57.** *See supra* note 5.

abused, the court's ruling will not be disturbed on review. [footnotes omitted] *NAACP v. New York*, 413 U.S. 345, 365–66, 93 S.Ct. 2591, 2602–03, 37 L.Ed.2d 648 (1973). Rule 24 merely provides without benefit of guidance that intervention must be "timely." The Third Circuit Court of Appeals has instructed "that the timeliness of a petition to intervene must be determined from all the circumstances, including the purpose for which the intervention is sought and the likelihood of prejudice to those already in the case." *Janusziewicz v. Sun Shipbuilding & Dry Dock Company*, 677 F.2d 286, 293 (3d Cir.1982). Three factors aid in determining the timeliness of intervention: "(1) how far the proceedings have gone when the movant seeks to intervene, (2) prejudice which resultant delay might cause to other parties and (3) the reason for the delay." *Commonwealth of Pennsylvania v. Rizzo*, 530 F.2d 501, 506 (3d Cir.), *cert. denied,* 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976), (citation omitted) (quoting *Nevilles v. EEOC,* 511 F.2d 303, 305 (8th Cir.1975)); *In re Fine Paper Antitrust Litigation,* 695 F.2d 494, 500 (3d Cir.1982). The appellate tribunal has stated that a "motion to intervene after entry of a decree should be denied except in extraordinary circumstances," *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania,* 674 F.2d 970, 974 (3d Cir.1982), and elevated the instruction to a presumption against intervention. *Id.*

▆ Applying the law to the facts mandates that intervention in the 1921 litigation should be conditionally denied. The issue as to proposed intervenors' standing to enforce the 1921 Consent Decrees unavoidably remains clouded. Uncertainty as to standing without more, however, is not the type of extraordinary circumstance which warrants intervention in a case closed for over sixty years. While it is possible that this case might in the future be placed in a posture where determination of the standing issue would be necessary, grant of intervention at this stage would be "premature and possibly unnecessary." *In re Fine Paper Antitrust Litigation,* 695 F.2d at 498. Resolution of the Bottler's Contract claims may render moot direct actions under the Consent Decrees. Applying the three factors set forth above, the first factor weighs so heavily against proposed intervenors at the present stage of procedural development so as to make discussion of the second factor, prejudice, unnecessary. Similarly, the third factor, reason for the delay, is concededly linked to the withdrawn standing holding,[58] and therefore warrants no discussion at this time.

While the Court has concluded at this time that extraordinary circumstances are not present which would warrant grant of the motions to intervene in the 1921 lawsuits, if resolution of the intervenors' Bottler's Contract claims and Shreveport's claims under the Consent Decrees does not also resolve any other bottlers' claims directly under the Consent Decrees, then the ruling should be revisited. But, it is unknown at this time whether there is any practical viability to proposed intervenors' theory of enforcement of the 1921 Consent Decrees as parallel but distinct actions by the bottlers on their individual contracts. Whether the intervenors would then be able to demonstrate "extraordinary circumstances" for purposes of meeting the timeliness requirement of Rule 24 is necessarily left to another day. The motions of the Thomas and Whitehead Bottlers to intervene in the 1921 case will be denied conditionally with leave to renew the motions at such time, if ever, as it seems to plaintiffs to be both necessary and appropriate.[59]

---

**58.** *See supra* pp. 264–265.

**59.** Having determined that the motion to intervene in the 1921 litigation should be conditionally denied as untimely, it is unnecessary and perhaps counterproductive to discuss the following other theories of plaintiff which appear in one form or another, both in support of standing and in support of intervention: privity of contract, assignment, virtual representation, res judicata, collateral estoppel, and third-party beneficiary. In addition, the motions to consolidate Case. No. 388, Case No. 389 and C.A. No. 81–48 will be denied since intervention in Case Nos. 388 and 389 has been denied.

## B. Intervention in the Current Litigation—C.A. No. 81–48

Unamended bottlers, including Shreveport, from the former Whitehead territory and bottlers from the former Thomas geographic area have moved to intervene in the current Elizabethtown case. They seek intervention of right under Fed.R.Civ.P. 24(a)(2)[60] and permissive intervention under Fed.R.Civ.P. 24(b)(2).[61] In contrast to its position with respect to intervention in the 1921 litigation, defendant concedes the motion to intervene in the Elizabethtown litigation is timely for purposes of Rule 24.

### 1. Permissive Intervention

Recognizing that intervenors' claims and the Elizabethtown suit have questions of law or fact in common, *see supra* p. 265, defendant does not object to permissive intervention.[62] In fact, defendant has gone further and at oral argument offered to waive available statute of limitation defenses for a reasonable period of time, not only with respect to the 33 proposed intervenors, but also any of the approximately 59 other unamended bottlers who have not yet sought to intervene. Given the geographical dispersion throughout thirty states of the United States of unamended bottlers who have not yet sought to intervene, they will be given sixty days from the date of the order approving the class representatives' form of notice to class members in which to file petitions for intervention, limited of course to the claims asserted by Elizabethtown.[63] Any effort to file a complaint in intervention after said sixty-day period will result, *inter alia,* in the complaint being subject to any statute of limitations defense which might be available to Coca-Cola and a possible finding of untimeliness.[64]

---

**60.** Rule 24(a)(2) reads:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

**61.** The pertinent portion of Rule 24(b)(2) reads:

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the right of the original parties.

**62.** The Company's position with respect to permissive intervention is that, should the Court be willing to deal with the myriad of problems posed by these many parties, the Company is willing to litigate all of these claims in one forum and in one action, provided that appropriate severance orders are entered at an appropriate time. Doc. 131, p. 40. It is obvious that both judicial and litigant economy will be effectuated by litigating all claims in one forum notwithstanding the potential for what in effect might be anywhere between thirty-three and ninety-three separate contract actions possibly implicating the law of thirty or more states.

**63.** Plaintiff, Elizabethtown, is expressly requested by the Court to promptly communicate defendant's waiver offer together with such explanation as it feels might be necessary. Choice of vehicle for communication is left to the discretion of Elizabethtown so long as there is filed with the Court a comprehensive document demonstrating beyond peradventure that the communication was timely received by each unamended bottler who has not yet sought to intervene.

**64.** The generous offer of Coca-Cola to waive for a reasonable time any defense arising from the expiration of any applicable statute of limitations in order to permit filing of intervention complaints, *see* Doc. 147 at 119, obviates potential knotty legal problems relating to tolling, complicated by the denial of class certification coupled with the motion for reconsideration and subsequent certification of issues. *See American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 552–56, 94 S.Ct. 756, 765–67, 38 L.Ed.2d 713 (1974). *Compare Pavlak v. Church,* 681 F.2d 617, 618–21 (9th Cir.1982) (pendency of unsuccessful class certification motion does not toll statute of limitation for purpose of class member's independent action), *cert. granted,* —— U.S. ——, 103 S.Ct. 3529, 77 L.Ed.2d 1382 (1983) *with Parker v. Crown, Cork & Seal Co.,* 677 F.2d 391, 393–94 (4th Cir.1982) (pendency of such a motion tolls statute of limitation for class members to intervene or to file independent lawsuit), *cert. granted,* —— U.S. ——, 103 S.Ct. 338, 74 L.Ed.2d 381 (1982). Coca-Cola's waiver only applies to any statute of limitations expiring during the inter-

■ The discretionary, uncontested holding that permissive intervention under Fed.R.Civ.P. 24(b) will be permitted does not end the intervention inquiry. The complaint makes clear that jurisdiction is based upon diversity of citizenship [65] and that unamended bottlers incorporated or having their principal place of business in Delaware or Georgia are excluded from the proposed class.[66] Two of the proposed intervenors are non-diverse.[67] Non-diverse parties cannot permissively intervene unless their claim is supported by an independent basis for federal jurisdiction. *Beach v. KDI Corporation,* 490 F.2d 1312, 1319 (3d Cir.1974); see *Pierson v. United States,* 71 F.R.D. 75, 81 (D.Del.1976). Since the proposed non-diverse intervenors are not members of the proposed class and are not able to intervene permissively, they can only become parties to this litigation by intervention as of right under Fed.R.Civ.P. 24(a)(2), under the ancillary jurisdiction of the Court. If non-diverse intervenors have an absolute right to intervene, they need not establish an independent source of jurisdiction. *CRI v. Watson,* 608 F.2d 1137, 1140 (8th Cir.1979); *Babcock and Wilcox Co. v. Parsons Corp.,* 430 F.2d 531, 540 (8th Cir.1970); *Pierson v. United States,* 71 F.R.D. at 81.

2. *Intervention as of Right*

■ Rule 24(a)(2) allows intervention as of right:

Upon timely application ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the

applicant's interest is adequately represented by existing parties.

Proposed intervenors urge three theories to support a finding of a legally protectible interest sufficient to support intervention of right:

(a) the bottlers have legally-protectible interests in the Consent Decrees by virtue of their status as (i) third-party beneficiaries and (ii) assignees; (b) the bottlers have legally-protectible interests in the consent decrees because those decrees are binding on the bottlers; and (c) the bottlers have identical interests in the "transactions" which are the subject of the litigation, namely, The Coca-Cola Company's substitution of HFCS–55 for sugar and its method of pricing of Bottlers Coca-Cola Syrup.

Proposed intervenors go on to argue that the *stare decisis* effect and possible preclusive effect of the Court's rulings in this case will as a practical matter impair the ability to protect their interests.

In opposing intervention as of right, Coca-Cola argues that the intervenors do not possess a legally protectible interest that relates to the subject matter of the Elizabethtown case. Coca-Cola denies that any unamended bottler has any rights under the Consent Decrees and that the transaction at issue in the Elizabethtown case, although similar to transactions between Coca-Cola and other unamended bottlers, is based only upon Elizabethtown's Bottler's Contract. They conclude by asserting that the ability of other bottlers to protect their interests in their contracts will not be impaired by the adjudication of the Elizabethtown case.

The intervenors' arguments are not without merit;[68] however, the Court need not

---

val between the filing of Elizabethtown's complaint on February 4, 1981 and the sixtieth day after the date of the Court's approval of the class representatives' form of notice to the class members. This waiver will only apply to those bottlers that actually intervene prior to the expiration of the sixty-day period.

**65.** Doc. 1, ¶ 4.

**66.** Doc. 1, ¶¶ 35(a), 50(a), 54(a); Doc. 55, ¶ 63.

**67.** The non-diverse intervenors are Decatur Coca-Cola Bottling Company, a Delaware corporation with its principal place of business in Decatur, Alabama, and Coca-Cola Bottling Company of West Point-LaGrange, Inc., a Georgia corporation with its principal place of business in LaGrange, Georgia.

**68.** The concept of a legally protectible interest sufficient to sustain intervention of right is amorphous. Readily apparent in factual contests where the disputed interest is a claim to a

choose between the positions. The interests of the two proposed intervenors will be adequately protected by the Elizabethtown and the other unamended bottlers who have been allowed to intervene permissively.

The burden of establishing inadequacy of representation is upon those seeking intervention. *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972); *Olden v. Hagerstown Cash Register, Inc.,* 619 F.2d 271, 273 (3d Cir.1980); *Commonwealth of Pennsylvania v. Rizzo,* 530 at 505. The burden is minimal; "it is enough to show that the representation 'may be' inadequate. *Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission,* 578 F.2d at 1345.

The two plaintiffs who propose to intervene as of right cannot satisfy their minimal burden. They seek intervention of right to assert the identical claims of Elizabethtown and permissive intervenors. The proposed intervenors' interest in this litigation, interpretation of the relevant provisions of the 1921 Consent Decrees and, possibly, the Bottler's Contracts, is identical to that of Elizabethtown and the other intervening bottlers. Moreover, the same counsel for proposed intervenors of right represents Elizabethtown, the other intervening bottlers and, in all probability, other unamended bottlers who will take advantage of the opportunity to permissively inter-

vene. In short, proposed intervenors of right are situated identically to Elizabethtown and permissive intervenors. As such, the interests of proposed intervenors of right are adequately represented by existing parties. *See Gabriel v. Standard Fruit and Steamship Company,* 448 F.2d 724, 725–26 (5th Cir.1971). (Denial of intervention as of right upheld where employees seeking to participate in class action against employer for breach of collective bargaining agreement were adequately represented by existing parties on question of breach and their counsel was also attorney for 36 class members.)

The non-diverse intervenors' interest that might be controlled or influenced by resolution of the common issues under the Consent Decrees will be adequately represented by the existing parties to this lawsuit. *See McClune v. Shamah,* 593 F.2d 482, 486 (3d Cir.1979). These intervenors will be able to pursue their claims in another forum. There will be no res judicata, collateral estoppel or "binding" *stare decisis* preclusion preventing proposed intervenors of right from pursuing their courses of action in other fora other than possibly on the issues for which they are adequately represented. In summary, insofar as proposed intervenors of right interests may be impaired by this litigation, "[they] will be adequately represented and with respect to

property interest, it eludes judicial definition in a more subtle factual matrix. One commentator has suggested it embraces aspects of standing. 3B Moore's, *Federal Practice* § 24.07[2]. Another commentator has suggested not tarrying over the concept, but looking instead to whether the asserted interest would be impaired by disposition of the litigation. See 7A Wright & Miller § 1908. The Supreme Court has instructed that there need not be a direct interest in the property or transaction at issue provided that the averted interest would be impaired by the outcome. *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129, 135–36, 87 S.Ct. 932, 936–37, 17 L.Ed.2d 814 (1967). Adverse holdings to plaintiff would substantially impair the ability of the non-diverse intervening plaintiffs insofar as it would embrace this Court's construing its own consent decree. *See In Re Fine Paper Antitrust Litigation,* 695 F.2d at 498. To the extent those hypothetical outcomes are considered to ema-

nate from construction of the 1921 Consent Decrees rather than an unamended Bottler's Contract, it would have a unique and unusually strong *stare decisis* effect. 3B Moore, *Federal Practice* ¶ 24.07[3]. Moreover, to the extent there is identity of language in the Bottler's Contracts and that language receives its first judicial interpretation, the *stare decisis* effect would necessarily be important. *See supra* p. 273. Rule 24(a) refers to impairment as "a practical matter" which means practical consideration other than strictly legal consequences may be considered. *Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission,* 578 F.2d 1341, 1348 (10th Cir.1978). As a practical matter adverse determination of the common issues under the Consent Decrees would seriously undermine if not completely obliterate proposed intervening plaintiffs' chances of prevailing in this or other forums on these issues.

the issue[s] on which [they] will not be represented, [they] will not be prejudiced." *Ionian Shipping Company v. British Law Insurance Co., Ltd.,* 426 F.2d 186, 190 (2d Cir.1970). It is concluded the interests of proposed intervenors are adequately represented by existing parties and are therefore barred from intervention as of right under Rule 24(a)(2).

*Conclusion*

In summary it has been held that:

1. The plaintiff's motion for reconsideration will be granted. The Court's previous holding, 95 F.R.D. at 175–77, with respect to plaintiff's standing to enforce the 1921 Consent Decrees will be withdrawn.

2. The plaintiff's motion for certification to appeal the Court's previous holding regarding the standing of the plaintiff to enforce the 1921 Consent Decrees will be denied.

3. The plaintiff's motion for class certification will be granted in part. The Elizabethtown case, C.A. No. 81–48, will proceed as a class on the common issues regarding the interpretation of the 1921 Consent Decrees. *See supra* note 33. Two, or possibly more subclasses of unamended bottlers will be certified. The parties within ten (10) days of the date of this Opinion should submit their views on Shreveport as a class representative and on the need for additional subclasses. *See supra* note 40. The remaining aspects of Elizabethtown's claims against Coca-Cola will be tried in a subsequent proceeding, pursuant to Rule 42(b). Any other aspect of Elizabethtown's motion for class certification, with the exception of the later certification of any other particular common issues suitable for class action treatment, will be denied.

4. Shreveport's motion to file a supplemental complaint in Case No. 389 will be denied.

5. All motions to intervene in Case No. 388 and Case No. 389 will be denied with leave to renew at a later time if appropriate.

6. All motions to consolidate Case No. 388, Case No. 389 and C.A. No. 81–48 will be denied.

7. The motions of unamended bottlers, other than the non-diverse bottlers Decatur Coca-Cola Bottling Co. and Coca-Cola Bottling Co. of West Point-La-Grange, Inc., to permissively intervene in C.A. No. 81–48 and to file complaints in intervention will be granted.

8. Any other diverse unamended bottler will be afforded sixty (60) days from the date of the Court's approval of the class representatives' form of notice to class members to intervene in C.A. No. 81–48. The defendant, Coca-Cola, has agreed not to assert any defense arising from the expiration of any applicable statute of limitation between February 4, 1981, the date of the filing of the complaint in C.A. No. 81–48 and for a reasonable time thereafter which the Court hereby determines to be sixty days from the date of the Court's approval of the form of notice to class members.

9. Motions of the non-diverse bottlers to intervene as of right in C.A. No. 81–48 will be denied.

An appropriate order will issue.